UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

Nicholas Cole Sinnett,

                Petitioner,            Case No. 2:21-cv-32

v.                              Honorable Janet T. Neff

Sherry Burt,

                Respondent.
_____/

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254.

Petitioner Nicholas Cole Sinnett is incarcerated with the Michigan Department of Corrections at

the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan.

On February 8, 2021, Petitioner filed his habeas corpus petition raising one

ground for relief, as follows:

> I.    My right to testify in my own defense was involuntarily waived as it was
> made out of duress and directly after I told the court I was threatened into
> making that waiver.

(Pet., ECF No. 1, PageID.6.)  Petitioner describes the facts that support his habeas ground as

follows:

> The judge asked me if I would like to testify . . . I said, "It would probably be
> better if I didn't."  She asked if I was threatened.  I said "Besides from Derrick
> Johnson, no." . . .  This man knew the robbery victim and had threatened me in
> the exact holding cell I was to be returned to.  He would have known if I would
> have uncovered the affair . . . which would have explained the circumstantial
> evidence against me. . . . No other evidence existed.

(*Id*.) (ellipses in original).

Respondent has filed an answer to the petition (ECF No. 9) stating that the Court should deny relief because consideration of Petitioner's habeas claim is barred by the doctrine of procedural default and, even if consideration were not barred, Petitioner's habeas claim lacks merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), the Court finds that Petitioner's habeas claim lacks merit.  Accordingly, the Court will deny the petition.

<u>**Discussion**</u>

**I.**    **Factual allegations**

On December 7, 2016, following a three-day jury trial in the Oakland County Circuit Court, Petitioner was convicted of armed robbery, in violation of Mich. Comp. Laws § 750.529, unlawfully driving away an automobile, in violation of Mich. Comp. Laws § 750.413, and use of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b.  On January 17, 2017, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to concurrent prison terms of 25 to 60 years for armed robbery and 2 to 20 years for unlawfully driving away an automobile, to be served consecutively to a sentence of 2 years for felony firearm.  All of those sentences, in turn, were to be served consecutively to sentences for which Petitioner was on parole at the time he committed the present offenses.

The Michigan Court of Appeals described the facts underlying Petitioner's prosecution as follows:

> On April 18, 2016, the victim, Kara Volpe, arrived home at approximately 9:00p.m. and saw a black pickup truck with its lights on in the road near her house.  As she exited her Jeep, the truck sped down the road.  On April 19, her husband, Joe Volpe, the vice-president of sales and purchasing at Detroit Wheel & Tire, received a call from a number with the northern Michigan area code of 231.  The caller identified himself as "Jason" and said that he wanted to meet with Joe that day to conduct some business.  Joe declined a meeting, but asked his

2

northern Michigan salesperson to contact the caller.  The caller thereafter sent a text message to Joe telling him not to share his phone number with anyone.

Later on April 19, Joe went home to do some work.  The lawn care person, Greg Watts, was working on the lawn when he saw a black Ford F-150 pickup truck drive past the house multiple times before parking in the street.  A man got out of the truck and walked up the driveway.  Around the same time, Joe's employee at Detroit Wheel & Tire, Jason Busti, stopped by.  The man, who had an "Amanda" tattoo on his neck, inquired about lawn care and obtained a business card from Watts.  The man also inquired whether the house was for sale and asked if he could go inside.  Busti went inside and told Joe about the man's inquiry.  Busti later saw the man walk to the F-150.  Busti identified defendant in court as the man he saw at the Volpe home on April 19.

On the afternoon of April 20, Kara and her mother, Charlene Rivard, were cleaning Kara's house when defendant, whom Kara testified she had never seen before, came to the door and inquired about the name of the lawn care person.  Defendant was dressed in professional attire and had a tattoo with the name "Amanda" going down his neck.  Defendant said that he had spoken to the lawn care person the day before but did not get his business card.  Kara gave defendant Watts's phone number.  Defendant then asked Kara if she was interested in selling her house.  When Kara told defendant that she had recently purchased the house, defendant told her that he could sell the house at a price that Kara knew exceeded the appraised value of the house.  She told defendant that she would have to talk to her husband.  Kara noticed defendant look down at her ring finger, and she felt compelled to tell him that she was not wearing her rings because she was doing spring cleaning.  Defendant asked if he could look at the house, and Kara permitted him to look around the outside only.  Defendant said that his name was "Mike" and he provided a business card with a phone number with a 480 area code.  Kara went inside and called Joe, who told her that a man had come to the house the day before and had the same inquiries.  Defendant came back to the door and asked Kara to come outside.  He asked her about the property line.  At that point, Kara noticed that defendant's worn black square-toed shoes with stitching on the top did not match his attire.  Defendant asked Kara questions about her Jeep, and before leaving, defendant told her that "a girl like her really should be wearing her wedding ring."  When defendant speculated that Kara's rings were in her Jeep, Kara told him that her rings were in the house.

Kara put her rings on before she and Rivard went to the store.  She forgot to lock the door to the house before leaving.  The two returned to the house about an hour later.  Kara went to the backyard and Rivard stayed inside the house.  As she was kneeling down to tie cushions on the patio chairs, Kara noticed a person dressed all in black, with only his forehead exposed, pointing a gun at her.  The man had white skin and had a tall and slim build like defendant.  Kara was 100 percent positive that the man was wearing the same shoes that she had seen defendant wearing earlier that day.  The man screamed at Kara and threatened to kill her if she did not give him her rings.  Defendant also threatened to shoot

3

Rivard when she went outside in response to Kara's screams.  The man demanded the key fob for Kara's Jeep.  As he went into the garage to retrieve the key fob, and before driving away in Kara's Jeep, the man said, "Tell Joe not to f___ with me and stay out of my shit."  Kara's wallet, which contained credit cards, a debit card, and cash, and her cell phone were inside the Jeep.  Kara placed a 911 call just before 4:00 p.m.

Police recovered Kara's Jeep about one-half mile from her home.  A pneumatic gun and Kara's cellular telephone were on the passenger seat.  Her wallet was missing.  Surveillance video of the parking lot of the business where police found Kara's Jeep showed a black F-150 back into a parking spot at 3:45 p.m. on April 20.  A man walked from the vicinity of the truck and across the parking lot.  At 4:02 p.m., the video showed Kara's Jeep pull into the parking lot and back into the parking spot next to the F-150.  The driver exited the Jeep and walked toward the F-150, which then drove off.

The police investigation linked the 231 telephone number to defendant.  A search of defendant's name produced a photograph of defendant.  Kara identified defendant in a photographic array as the man who had been at her house the day of the robbery.  Police subsequently arrested defendant at a house on Mulberry Street in Wyandotte.  Defendant admitted that he drove the black F-150 that was backed into the driveway at the house.  A zippered pouch containing Joe's business card, pawn shop business cards, and real-estate-related business cards was found during a search of the F-150.  Jewelry and documents regarding jewelry were discovered during a search of the Mulberry Street home, which belonged to defendant's girlfriend, Collette Morton.  Morton had an Arizona driver's license with an address in Mesa, Arizona.  The area code in Mesa is 480, which is the same area code for the phone number that Kara received from defendant.

Defendant provided police with information about a man named Duane Butler and said that Butler was involved with stolen cars, wheels and tires, and credit card manufacturing devices.  He provided a tip about an address on Minock Street in Detroit and said that there would be a green Dodge Ram, which was used as a "push vehicle," in the driveway.  Police verified that Butler was the owner of the residence.  Police observed the green Dodge Ram in the driveway.  When the police ran the license plate of the vehicle, the Law Enforcement Information Network (LEIN) system indicated that the vehicle was reported stolen.  Butler, a heavyset black man, arrived home while the police were at the residence.  During a search of the garage at the property, a stolen Dodge minivan that contained tools to remove tires and wheels, as well as "blocks" for lifting, were found.  Many of the wheels and tires found in the garage were matched to stolen vehicles.  A credit card reader and several blank Visa gift cards were found inside the residence.  Five credit cards, including three of Kara's credit cards, were found in a nightstand.  Also found was a check for $2,000 from Detroit Wheel & Tire to Duane Butler for payment of a purchase order.  Duane Butler had been a customer of Detroit Wheel and Tire for a year prior to the robbery.  He previously had seen

4

Kara at the business and had made a comment to Joe about Kara's engagement ring and asked what he paid for it.  Joe told Butler that he paid about $30,000 for the ring.

*People v. Sinnett*, No. 336775, 2019 WL 2062818, at *1–2 (Mich. Ct. App. May 9, 2019) (footnotes omitted).

Although Petitioner, in defending against the charges, contested many of the facts described by the court of appeals, he does not claim that the court's description of the evidence as it was introduced at trial is inaccurate.  Moreover, except to the extent that he challenges the determination that there was overwhelming evidence of his guilt, his habeas claim does not depend on a determination that the court of appeals' determinations of fact were unreasonable on the record.  Additionally, "[t]he facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).

Petitioner claims that if he would have testified, he could have offered explanations that would have created reasonable doubt and he would have likely been found not guilty.  Petitioner did not testify because of an alleged threat.   The "threat" came from another person who was in a holding cell with Petitioner at the courthouse.

Petitioner's "threat" story evolved over time.  Understanding the evolution of Petitioner's "threat" story is necessary to understand how the trial court addressed it.  Understanding the evolution also requires recounting significant portions of trial and hearing transcripts.

Petitioner's explanation of the threat—where it was made, when it was made, and the nature of the threat—first appears in the trial transcript for the third day of trial.  Petitioner's counsel raised the matter first:

| | |
|---|---|
| Ms. Loftin: | My client made me aware the last time that he was in the Oakland County Jail that his entire discovery packet and notes were taken. It was during a time where he was actually up in front of your Honor.  I believe it was the motion or the last time that he was here.  And he left his paperwork downstairs.  When he returned it was gone. |
| The Court: | He left it downstairs where and with whom? |
| Ms. Loftin: | In the lockup. |
| The Court: | Okay.  Did he leave it with the deputies?  Did he – |
| Ms. Loftin: | No, in the cell with the remaining people. |
| The Court: | Okay. |
| Ms. Loftin: | He had made me aware of that.  I had to make him a copy of everything again.

Then yesterday he was threatened by an individual in the jail that made him aware that there was an individual that would be coming today to testify against him as a rebuttal witness.  Obviously, I wasn't aware of this.

I did confirm with Mr. Meizlish that there is a – there is a person in custody downstairs by the name of Derrick Johnson that is going to be called as a rebuttal witness. |
| The Court: | Okay. |
| Ms. Loftin: | Based on the fact that my client was threatened over this situation I would like an opportunity since we just found out about this to discuss – |
| The Court: | Help him (to fix defendant's tie). |
| Ms. Loftin: | To discuss my client's decision whether or not he wishes to testify. |
| The Court: | Okay. |
| Ms. Loftin: | This penalty on these charges are extremely serious as you know and this, this – |
| The Court: | Well okay I, I don't know what this person would testify to in rebuttal to what. |
| Ms. Loftin: | Neither do I. |

6

| The Court: | Okay.  But rebuttal witnesses are rebuttal witnesses. |
|---|---|
| Ms. Loftin: | Of course. |
| The Court: | They're not – you know witnesses that you normally would be interviewing.  So I don't know if that person would be called if your client decides not to testify or if your client – I don't know so – |
| Ms. Loftin: | Understood. |
| The Court: | – but you want an opportunity to talk to the rebuttal witness or you want – |
| Ms. Loftin: | No. |
| The Court: | – an offer of proof? |
| Ms. Loftin: | Well I'd like an offer of proof based on the fact that we believe this individual stole my client's discovery packet and notes. |
| The Court: | Okay. Well I, I don't know – I'm not going to speak for Mr. Meizlish, but he's a rebuttal witness, I don't know that you get an offer of proof or you get a – you know— |
| Ms. Loftin: | Understood. |
| The Court: | – I – so you can certainly ask him if he comes and testifies whether he had access and whether he read or – you know you can certainly – that's fine.  What else would you want? |
| Ms. Loftin: | I would like time to talk to my client before he makes his decision whether or not to testify. |
| The Court: | Okay.  And you haven't talked to him up until now? |
| Ms. Loftin: | I have talked to him, but now that I have confirmed that this individual will be called, I think that's a detail that definitely needs to be discussed before he makes that decision. |

(Trial Tr. III, ECF No. 10-7, PageID.279–280.)[1]  From this exchange, it appears that Petitioner's

discovery packet was taken during the weeks before trial.  Then, on the second day of trial,

Petitioner was threatened by "an individual in the jail," stating that there would be another

---

[1] The trial transcript includes a number of grammatical errors.  The excerpts from the transcripts quoted herein appear as they were transcribed.

individual that would be coming to testify as a rebuttal witness against Petitioner.  The rebuttal witness was Derrick Johnson.  From this first exchange—which was filtered through counsel and did not come directly from Petitioner—it does not appear that Mr. Johnson made the threat. Instead, it appears that Mr. Johnson was the culmination of the threat:  if you testify, a rebuttal witness will testify as well.

Petitioner and counsel were provided an opportunity to further discuss Petitioner's decision to testify.  After the discussion, and the completion of the prosecutor's case, Petitioner placed his decision regarding testimony on the record:

| | |
|---|---|
| Ms. Loftin: | Your Honor, we have made a decision.  You can stand. |
| The Court: | Swear him in. |
| Court Clerk: | Please raise your right hand.  Do you swear or affirm the testimony you're about to give is the truth and nothing but the truth. |
| Defendant: | I do. |
| Ms. Loftin: | Can you state your name for the record, sir? |
| Defendant: | Nicholas Cole Sinnett. |
| Ms. Loftin: | And, Mr. Sinnett I have been your attorney since the inception of the case, is that correct? |
| Defendant: | Correct. |
| Ms. Loftin: | And we have had hours upon hours to discuss this matter, fair to say? |
| Defendant: | Fair to say. |
| Ms. Loftin: | And we have spent a lot of time in discussing whether or not you would take the stand in this matter, correct? |
| Defendant: | Yes, ma'am. |
| Ms. Loftin: | Okay.  And as we stand here today and you are here to make your final decision, do you wish to testify or do you wish to remain silent? |

Defendant:     It would be better for me to stay silent.

Ms. Loftin:    Has anyone promised you or threatened you to get you to make this decision?

Defendant:     Besides Derrick Johnson, no.

The Court:     All right.  Mr. Sinnett, this is your decision as to whether you want to testify or not.  You've talked to your attorney at length prior to this case starting, during this week, additionally this morning.  Has anyone promised you or threatened you?

Defendant:     I actually, ma'am, I had intended on taking the stand the whole time until this morning I was – I had made my attorney aware that I had been threatened in the past.  That my paperwork had been stolen and she knew of it and I only recently –

The Court:     What, what was the threat? What was the threat and where did it come from?

Defendant:     The threat came from a black guy they call DJ that was in your holding tank down here the last time I was down here.

The Court:     I don't have a holding tank.

Ms. Loftin:    The holding –

The Court:     The whole tank for the Court.

Defendant:     Yeah, they have a specific one for you.

The Court:     Okay.

Defendant:     And I was down there.  I had used the bathroom and the gentleman look, looked at my paperwork when I was using the bathroom and saw the name –

The Court:     What, what was the threat?

Defendant:     The threat was don't be a rat.  Don't be a rat.  I know Duane and I was like –

The Court:     He's threatening you, telling you not to be a rat.

Defendant:     Right.

The Court:     How is that a threat?  Who are you going to rat on?

9

Defendant:      Because I was going to give testimony about Duane Butler about – you know what he does.

The Court:      Okay.

Defendant:      All that stuff and he's on a federal hold right now in another jail.

The Court:      What does that have to do about this case and your decision to testify in this case?

Defendant:      Because then they could use me as a witness against him.

The Court:      What does your testimony – what does that have to do with this case, the testimony you were going to give?

Defendant:      Oh it was going to bring a light that the danger this man was, how I did not know him.  That – how those two couples knew that man, they were in direct business with him.  They got found with their –

The Court:      So you were going to accuse someone else and say someone else did this, I didn't do that, correct?

Defendant:      Yes, he was found with their merchandise.

The Court:      Okay.

Defendant:      I wasn't.

The Court:      Okay, Mr. Sinnett, I don't know what is true and what is not true.

Defendant:      Yes.

The Court:      Okay.  In terms of what you did or didn't do, what this other person did or didn't do.

Defendant:      Yes, ma'am.

The Court:      You are the one who this jury is going to decide in terms of this case whether you did this or not, okay.

Defendant:      Yes, ma'am.

The Court:      It is up to you to decide whether you want to testify or not.  If you think it's in your best interest to testify and say whatever it is that you want to say in front of this jury then you do it.  If, if you don't want to do it, you don't do it.  It is your decision ultimately.

You've had plenty of time to speak with your attorney, correct?

10

| | |
|---|---|
| Defendant: | Yes, ma'am. |
| The Court: | Okay.  And so you know you have an absolute not to testify. |
| Defendant: | I do. |
| The Court: | And that I'm going to instruct the jury that they are to not take that into account whatsoever in their deliberations because you have a right not to testify, you understand that? |
| Defendant: | Yes, ma'am. |
| The Court: | Okay.  You also have a right to testify if you want to.  Okay. So when Ms. Loftin is asking you whether anyone has promised you anything or threatened you you're indicating to me that you're deciding not to testify because of something you heard from another person that's in custody, correct? |
| Defendant: | That the prosecution plans to call against me as a rebuttal. |
| The Court: | It doesn't matter – that doesn't matter.  You're indicating the reason why you're not going to testify is because someone else that's in custody – |
| Defendant: | Yes. |
| The Court: | – has accused or, or said to you don't be a rat. |
| Defendant: | Because I told her immediately when my stuff came up missing. |
| The Court: | Okay.  All that aside, I don't know any of this and I don't know the truth to any of that.  Okay.  So all I'm hearing is that someone is accusing you of potentially if you testify that you might be a rat, okay.  Correct? |
| Defendant: | Right. |
| The Court: | Okay.  There have been no threats other than that, other than those statements, correct? |
| Defendant: | I mean that's the most serious one, yes. |
| The Court: | Okay, all right.  Mr. Sinnett, it is your decision.  Now with all the circumstances that are out there, with whatever may or may not, with the advice that you've been given, even despite everything, okay, and whatever advice she's given you, ultimately it is your decision.  So it is your decision not to testify? |
| Defendant: | Can I ask your Honor one question before I – |

11

| | |
|---|---|
| The Court: | What is that? |
| Defendant: | I am a little afraid about the jury members seeing the, the Derrick Johnson out in the hallway.[2] |
| The Court: | That's been resolved.  That's not an issue. |
| Defendant: | Does that affect me though?  I, I – |
| The Court: | How does that – listen, I'm not here to give you legal advice, that's not my job.  Okay.  You are to tell me now whether you want to testify or not? |
| Defendant: | No. |
| The Court: | Okay.  And you understand that once this case is done whatever their verdict is you can't come back here later and tell me you didn't have enough time with Ms. Loftin to discuss this issue.  That you would have testified based on a thousand different things. You understand that?  This is your time to decide this. |
| Defendant: | Yes, ma'am. |
| The Court: | Okay.  And you've done that knowing all the circumstances with all the advice that she's given you, all the information that's out there, that's your decision? |
| Defendant: | Yes, ma'am. |
| The Court: | Okay. |
| Prosecutor: | Your Honor, I, I – because this has gone on for a few minutes, I can't remember if he was specifically voir dired about he understands his constitutional right to testify, not to testify, can't be held again – |
| The Court: | I think – I think we've both gone over it.  Mr. Sinnett, you know you have an absolute constitutional right not to testify.   As I indicated, the jury is going to be instructed that they're not to hold that against you. |
| Defendant: | Yes, ma'am. |

---

[2]  The morning of the third day of trial, the prosecutor was speaking to the prospective rebuttal witness, Derrick Johnson, in the chambers hallway outside the courtroom.  (Trial Tr. III, ECF No. 10-7, PageID.280–281.)  At the time, Mr. Johnson was handcuffed with four deputies accompanying him.  The door accessing the hallway was opened while a juror waited outside the door such that the juror might have seen the handcuffed prospective rebuttal witness accompanied by deputies.  The trial judge questioned the juror to determine if she had seen the witness handcuffed and surrounded by deputies; but the juror had not.

| | |
|---|---|
| Prosecutor: | And I'm sorry, your Honor, an absolute right to testify if he so chooses. |
| The Court: | I think I've done that again, but I'll do it again. |
| Prosecutor: | Thank you. |
| The Court: | And you have an absolute right to testify, you understand that right too, right? |
| Defendant: | Yes, ma'am. |
| The Court: | Okay.  And ultimately this is your decision.  It's not Ms. Loftin's decision.  It's not anyone else's decision, this is your decision, correct? |
| Defendant: | Yes, ma'am. |
| The Court: | Okay, thank you.  Bring in the jury. |

(Trial Tr. III, ECF No. 10-7, PageID.284–286.)

Based on Petitioner's account of the events, the person who was in the cell "the last time [Petitioner] was down [t]here," and who communicated the threat, was Derrick Johnson.  Thus, some time before trial started, according to Petitioner, Derrick Johnson stole Petitioner's discovery packet, read it, and determined that Petitioner might implicate Duane Butler in criminal activity.  Presumably the discovery packet included the police reports which would have memorialized the fact that Petitioner had already implicated Duane Butler in criminal activity.

There is no question that Petitioner "ratted out" Duane Butler.  He informed police about Butler's address and what they might find there; police found stolen wheels and tires and the vehicles and tools Duane Butler used to steal vehicles, wheels, and tires, and the credit cards of the armed robbery victim.  According to Petitioner, Derrick Johnson told Petitioner that Johnson knew Duane Butler and stated "don't be a rat."  (Trial Tr. III, ECF No. 10-7, 284.)  Petitioner took the statement to be a prospective instruction backed by an entirely

13

implicit threat to do harm to Petitioner if he disobeyed the instruction. Arguably, the statement might also have been chiding Petitioner for having already ratted out Duane Butler or encouragement to Petitioner to abide by the code of honor among thieves (or at least those accused of being thieves).

It is important to keep in mind that Petitioner never told police that Duane Butler was involved in the armed robbery with which Petitioner was charged. Indeed, at the time of the interview during which Petitioner ratted out Duane Butler, Petitioner purportedly did not even know of the armed robbery. (*Ginther* Hr'g[3] Tr., ECF No. 10-10, PageID.399–402.) The "ratting" had to do with car thievery, not the armed robbery. The discovery packet could not, therefore, have indicated that Duane Butler was involved in the armed robbery or that Petitioner said Duane Butler was involved in the armed robbery.

Moreover, it is difficult to sort out what Petitioner might have testified about relating to Duane Butler that would have exonerated Petitioner. Petitioner offers affidavits that suggest he ran into Butler at the victim's home during an attempted contact with the victim the night before the robbery. (Pet'r's Aff., ECF No. 10-11, PageID.595–596.) That was purportedly how he gained the information regarding Butler that he was able to provide to police. To lure the apparently dangerous Butler away from the home of the victim, Petitioner went with Butler to Butler's house to discuss a possible transaction. Butler commissioned Petitioner to steal a luxury vehicle.

At the *Ginther* hearing Petitioner clarified the nature of the testimony he would have offered that would have exonerated Petitioner and implicated Butler. Petitioner was going

---

[3]In *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), the Michigan Supreme Court approved the process of remanding to the trial court for an evidentiary hearing when an appellant has raised claims of ineffective assistance of counsel that require development of a record.

to testify that the police found the victim's credit cards at Butler's house.  (*Ginther* Hr'g Tr., ECF No. 10-10, PageID.517.)  Of course, Petitioner had no personal knowledge of that fact. Testimony regarding that fact from Petitioner would have been inadmissible hearsay.

Also, by this point it should be apparent that the story Petitioner told the judge at trial is significantly different than the story Petitioner is telling this Court.  The petition claims that Derrick Johnson knew the victim and did not want Petitioner to testify ***regarding the affair***. Petitioner never mentioned a word about that to the trial judge.  And the discovery packet would not have indicated that Petitioner was involved in an affair with the victim because Petitioner never made that claim to the police.  (*Ginther* Hr'g Tr., ECF No. 10-10, PageID.434–435.) There was no mention of the affair until Petitioner's sentencing hearing.[4]  Of course, whether Derrick Johnson's alleged threat was protecting Duane Butler's honor or the victim's, it would be understandable that Petitioner was taken aback when Derrick Johnson was again in the holding cell on the morning when Petitioner was scheduled to testify.

The Court has carefully examined the record to determine when Petitioner's story changed.  It changed at Petitioner's sentencing hearing.  At that hearing, he first stated that the threat was intended to prevent disclosure of the affair and it was made to protect the armed robbery victim.  (Sentencing Hr'g Tr., ECF No. 10-8, PageID.310–311.)  Those statements were part of a two-pronged attack on his convictions, an attack that was founded on the affair:  first, Petitioner argued that he had two witnesses ready to testify on his behalf—Petitioner did not state at that time what the witnesses would have testified about—but they were directed to the

---

[4] Petitioner claims that he had told counsel about the affair and encouraged her to investigate and call witnesses who could testify regarding Petitioner and the victim being together during the weeks before the robbery.  But Petitioner never told police about the affair because they never asked.  (*Ginther* Hr'g Tr., ECF No. 10-10, PageID.434–435.) The affair was never hinted at in trial preparation.  During cross-examination Petitioner's counsel asked the victim whether she had an affair with Petitioner, but the victim indicated she had never seen Petitioner before he showed up at her house on the day of the robbery feigning interest in her real estate.  (Trial Tr. II, ECF No. 10-6, PageID.232.)

wrong courthouse by his attorney's secretary; and second, the threat that stopped him from testifying related to uncovering the affair with the victim, rather than the criminal activity of Duane Butler.  (*Id*., PageID.309–311.)  Petitioner embellished the latter claim by representing to the trial court that his attorney was so cowed by "the materiality and substance of the threat" that she told Petitioner she would have to discontinue the representation if Petitioner took the stand.  (*Id*., PageID.310.)

Petitioner offered additional substantiation of the threat because, according to Petitioner, it was actually carried out.  Petitioner reported that a "vehicle matching that description from which the threat originated, Kara Volpe's" vehicle, hit Petitioner's girlfriend's vehicle during the weeks after the verdict but before the sentencing.  (*Id*., PageID.311.)  The "hit and run" incident is a story within the story that is illustrative of the overarching questions regarding Petitioner's credibility.

It appears to be undisputed that Petitioner's girlfriend was involved in a "hit and run" accident on Christmas day, 2016.  He attaches the crash report to his petition.  (ECF No. 1-1, PageID.25–28.)  The most significant question regarding this consummation of the threat would be, "[W]hy?"  If made, the threat worked.  Petitioner did not testify regarding the affair.  As of Christmas day 2016, there was no reason to think that the victim was aware that Petitioner intended to bring up the affair as a challenge to his conviction, particularly when he was not willing to bring it up to prevent the conviction.

Another difficult question is whether the target of the vengeful hit and run had a relationship with Petitioner that might justify carrying out the threat against her.  Petitioner offered conflicting sworn testimony regarding that issue at the *Ginther* hearing.  Petitioner first described Collette Morton, the hit-and-run victim, as his girlfriend.  (*Ginther* Hr'g Tr., ECF No.

16

10-10, PageID.416.)  But later in the hearing, when it better suited his position at that moment,

Petitioner offered the following testimony:

> Prosecutor:   And Collette Morton was your girlfriend, right?
>
> Petitioner:   Not necessarily.
>
> Prosecutor:   Friend of yours?
>
> Petitioner:   Yes.
>
> Prosecutor:   Nothing romantic?
>
> Petitioner:   I wouldn't call it romantic, maybe – no, nothing romantic, no.

(*Id.*, PageID.497.)

Later in the hearing, when Petitioner turned his attention back to the threat, Ms.

Collette again became Petitioner's girlfriend:

> Prosecutor:   Did Johnson threaten you or your spouse?
>
> Petitioner:   Both.  I mean, I – I – I understood it as both.
>
> Prosecutor:   Who's your spouse?
>
> Petitioner:   Again, Collette Morton wasn't the only girl that I had been messing with.  I wouldn't call her a spouse or anything, but you know, she's –
>
> Prosecutor:   Because you –
>
> Petitioner:   – a – a girl associate.  I guess you could call her a girlfriend, maybe.  I mean, yeah, I – I've called her a girlfriend in the past, I guess.

(*Id.*, PageID.519.)  Ignoring, for the moment, how the armed robbery victim knew the precise

whereabouts of Petitioner's "girl associate"—apparently one of at least two girl associates—at a

particular time on Christmas day, Petitioner's ambivalence would certainly render the victim's

choice of a vengeance hit and run target questionable.

But setting aside that the victim did not understand how extortion works—the extorter is not supposed to carry out the threat if the threat succeeds.  And setting aside that the victim made an odd choice of target;  the victim also did a particularly sloppy job in carrying out the threat, so sloppy, that it is doubtful that Collette Morton was the specific target of this hit and run.

Petitioner describes the accident as follows:

| | |
|---|---|
| Prosecutor: | Did someone try to – are you claiming that someone tried to kill Collette Morton or hurt her? |
| Petitioner: | Well, after I had made the allegation known to the Judge when she asked me if I was threatened, I said yes; two weeks later after Collette left the jail from visiting me, a black SUV with black rims on a clear day, no raining, no snow, clear day, sideswiped three cars, T-boned Collette Morton, flipped her car over the side median and drove off never to be caught by police.  And the police report number is Michigan State Police report number 227569-12 Metro South Police Post, Taylor, Michigan and then, the police report was made, the – the black SUV and just so happened, I – I made the threat known two weeks beforehand and it – it happened two weeks after. |
| Prosecutor: | So, someone did this, even though you never testified at trial? |
| Petitioner: | Well, I – I – I couldn't – yeah, somebody did that, I – but I couldn't testify, I was under threat. |
| Prosecutor: | But – but you – but you didn't testify? |
| Petitioner: | Right. |
| Prosecutor: | You're saying someone did this anyway, even though you didn't testify? |
| Petitioner: | Yeah.  Well, I stood up and told the Judge about the – the affair, so I guess that was enough.  I mean, I – I – I really thought that somebody would – since the guy was here, at least, call him to stand and say, you know, did you threaten or you can't threaten this man or – nothing was ever done.  It was just looked at like I was lying.  And then, two weeks later, Michigan State Police Report Number, they tried to kill her.  So, I mean, I guess that's all I have to say about that. |

(*Ginther* Hr'g Tr., ECF No. 10-10, PageID.519–521.)

        So the extorter took the unusual step of hitting two cars before caroming into Collette Morton's vehicle.   The police report includes this description of the accident and drawing:



(ECF No. 1-1, PageID.28.)  Collette Morton drove vehicle 4.

        Petitioner also took some liberties with the content of the police report.  He testified that Ms. Morton's vehicle flipped over the median.  Actually, Vehicle 3 flipped over the median.  Petitioner also took some liberties when testifying that vehicle 1, the hitter and runner, matched the description of the robbery victim's vehicle.  The trial and hearing transcripts disclose that the victim's vehicle was a black Jeep Cherokee, apparently with black rims.  The police report, however, indicates that Vehicle 1 was a Ford Explorer and does not identify the color.  (*Id.*, PageID.25.)

        The threat and its impact on Petitioner's decision to not testify was not the only subject of the *Ginther* hearing.  Indeed the main focus of the *Ginther* hearing was counsel's purported failure to properly use the witnesses who had allegedly seen Petitioner and the victim together in the weeks preceding the robbery—witnesses who could corroborate Petitioner's

claim that he was involved in an affair with the victim.  Petitioner contended that his counsel's secretary sent two of the witnesses to the wrong courthouse on the day they were supposed to testify.

The poetic license Petitioner takes with the accident report is rather tame compared to the entirely incredible testimony Petitioner offered at the *Ginther* hearing regarding the several prospective witnesses who purportedly saw Petitioner and the victim together before the robbery.  Indeed, based on Petitioner's telephone conversations, emails, and letters, as introduced by the prosecutor at the *Ginther* hearing, Petitioner bought, or at least made an offer of significant consideration, to get his witnesses to testify regarding those matters.  The prosecutor's presentation was so compelling that, in the end, Petitioner and his counsel agreed not to call a key witness that could have possibly corroborated Petitioner's claims.

Petitioner also embellished the nature of the harm he might have faced in the holding cell if he had testified:

| | |
|---|---|
| Counsel:[5] | And you mentioned a person named Derrick Johnson? |
| Petitioner: | Yes, sir, I did. |
| Counsel: | All right.  Now, is there a holding cell in the basement of this building? |
| Petitioner: | Yes, sir, there is. |
| Counsel: | Now, were you and he in the same area together? |
| Petitioner: | Yes, sir, we were. |
| Counsel: | Now, what – is that – is that like one room or what? |
| Petitioner: | It's one room, it holds about 30 guys and each Judge has their own specific room that – that people go to. |

---

[5] Petitioner's counsel at the *Ginther* hearing was Daniel Bremer.  Attorney Bremer was Petitioner's third appellate counsel.  The first two were permitted to withdraw.  The second attorney sought leave to withdraw because counsel considered Petitioner's demands with regard to securing affidavits to corroborate the "affair" story to be unethical.

Counsel:        Okay.

Petitioner:     And I was in this room with him and 20 of his buddies.

Counsel:        Okay.  In – in – in the room that's assigned to Judge Jarbou?

Petitioner:     Yes, sir.

Counsel:        He had you and 21 other people?

Petitioner:     Well, it was probably me and 30 other people, but only 20 of them were his friends, yeah.

Counsel:        Okay.  Well, how do you know they were his friends?

Petitioner:     Because they're all a clique.  It's a gang thing.  They've all got gang signs tattooed to them.

Counsel:        Were they making signs to each other?  I just want to get this as clear as possible.

Petitioner:     Yeah, they all sit in a group like, the Bloods sit over here or –

Counsel:        Right.

Petitioner:     – you know what I mean.  That's – that's just how that goes.

Counsel:        All right.  And did Mr. Johnson say something to you?

Petitioner:     Yes, he did.

Counsel:        What did he say?

Petitioner:     He said –

        Prosecutor:     Objection, hearsay.

        Counsel:        Well, it's not – it's not for the proof of the matter.  It's not to prove that what he's saying is true, it's just whether this caused Mr. Sinnett to do something or not do something.

        The Court:     All right.  Well – so, he said something to you.  Did it cause you to do anything –

        Petitioner:     Yes, ma'am.

        The Court:     – or not do something?

> Petitioner:     Yes, ma'am.  It – it scared me and I advised my attorney at – at which point, she told me to stand up and advise the Judge and I did.
>
> Counsel:     All right.  And what – what did he say to you?
>
> Petitioner:     He told me do not be a rat to the affair or on D – on [Duane] Butler.

(Ginther Hr'g Tr., ECF No. 10-10, PageID.513–515.)

Ultimately, the story Petitioner tells this Court only works if he in fact said something about the affair before the accident.  Accordingly, he testifies "Well, I stood up and told the Judge about the – the affair, so I guess that was enough."  (*Ginther* Hr'g Tr., ECF No. 10-10, PageID.521.)  It is at that point that Petitioner gets caught in his own tangled web.  He did not stand up and tell the judge about the affair until three weeks after the accident.

The trial court listened to Petitioner's implausible account regarding his sexual relationship with the victim and then Petitioner's cross-examination that was nothing short of tortuous because Petitioner was so evasive.   The court considered "the totality of the circumstances and assess[ed] the credibility, veracity, vocal tone and expression, tonality, and honesty of the witness testimony presented . . . ."  (Oakland Cnty. Cir. Ct. Op. & Order, ECF No. 10-11, PageID.860.)  The court found the testimony of Scorpio Lenoir regarding his contact with Petitioner and the victim prior to the robbery to be incredible.  The trial court found Petitioner's story regarding the affair with the victim and trial counsel's alleged mishandling of the witnesses to be incredible.   The judge found that after "hearing Defendant's rendition of his alleged relationship with 'the lady' . . . there is no reasonable probability that the result of the trial would have been different had Defendant testified on his behalf."  (*Id*., PageID.861.)

The court of appeals' rejection of Petitioner's claim regarding the voluntariness of the waiver of his right to testify did not depend on whether the waiver was actually voluntary.

Instead, the appellate court also focused upon whether Petitioner's testimony could have possibly made a difference at the trial:

> Even assuming that the trial court's handling of defendant's waiver of his right to testify was erroneous, the record does not support a finding that the error affected the outcome of the trial.  The trial court, which had the ability to assess defendant's credibility, found significant portions of defendant's testimony at the *Ginther* hearing to be incredible, and it is likely that a jury would have similarly found defendant's testimony incredible had he testified at trial.  Thus, defendant has failed to show any plain error affecting his substantial rights.  *Carines*, 460 Mich. at 763–764.

*Id*.  Moreover, it is noteworthy that the court of appeals addressed the issue only with regard to Petitioner's claim that his testimony would inculpate Duane Butler,[6] not because it would reveal the affair.  That limitation is not surprising in that, although the *Ginther* hearing either expanded or completely altered the alleged threat to focus on the affair, the appellate briefing spoke only to the implicit threat of harm if Petitioner ratted out Duane Butler.  (Pet'r's Appeal Br., ECF No. 10-11, PageID.818–820; Pet'r's *Pro Per* Suppl. Br., ECF No. 10-11, PageID.880–885.)

      The Michigan Supreme Court denied leave to appeal, but Justice Cavanaugh wrote a concurring opinion that provided a lot more detail regarding the trial court's remedial efforts after Petitioner disclosed the "threat."   Justice Cavanaugh concluded that there were constitutional concerns regarding that threat and that she did not believe Petitioner had voluntarily waived his right to testify.  Nonetheless, Justice Cavanaugh—who had the benefit of Petitioner's fantastic stories from the sentencing and *Ginther* hearings—concluded that the evidence against Petitioner was so overwhelming that she could not "conceive what [Petitioner] could have testified to that would have altered the verdict."  *People v. Sinnett*, 936 N.W.2d 689,

---

[6] Mr. Butler's name is spelled as "Duane" in the trial transcript, (Trial Tr. III, ECF No. 10-7, PageID.284); it is spelled as "Dwayne" in the remand hearing transcript, (Ginther Hr'g Tr., ECF No. 10-10, PageID.515).  The Court will use "Duane."

692–93 (Mich. 2020) (footnote omitted).  Therefore, Justice Cavanaugh believed any error was harmless.

## II.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693–94 (2002).   An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)).   This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus,

the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*,

271 F.3d 652, 656 (6th Cir. 2001).  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review.  The federal court is not free to consider any possible factual source.  The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).  "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits.  *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d)"— for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*.  *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Harmless error

The Supreme Court clearly established an accused's right to testify in *Rock v. Arkansas*, 483 U.S. 44 (1987):  "At this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  *Id.* at 49.  The Court concluded that the right to testify arises from several sources, including the Fourteenth Amendment guarantee of due process, the Sixth Amendment rights to compulsory process and self-representation, and the Fifth Amendment guarantee against compelled testimony.  *Id.* at 49–53.  Like other constitutional

rights, the right to testify can be waived, but only if the waiver is knowing and voluntary.  *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000) ("The right of a defendant to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant.").

Petitioner posits that his decision to forego offering testimony was involuntary because it was prompted by Derrick Johnson's statement, "Don't be a rat.  I know Duane." (Mich. Ct. App. Op., ECF No. 10-11, PageID.563.)  The trial court, quite obviously, did not consider that statement to be the sort of threat that would render Petitioner's decision to not testify involuntary.  (Trial Tr. III, ECF No. 10-7, PageID.284, 285) ("The Court:  How is that a threat?" and "The Court: . . . So all I'm hearing is that someone is accusing you of potentially if you testify that you might be a rat, okay.").

It is apparent that the trial court concluded that Petitioner's waiver of the right to testify was voluntary.  It is not clear from the trial transcript whether the court did not believe Petitioner's story regarding the statements or did not believe the statements were sufficiently coercive to render Petitioner's waiver involuntary.  Perhaps because the grounds for accepting the waiver despite the "threats" were not clear, the court of appeals did not rely on either ground, but decided the issue on whether Petitioner's waiver prejudiced him.

Even if Petitioner's waiver of the right to testify were involuntary, he would not be entitled to habeas relief if the error were harmless.  *See, e.g., Solomon v. Curtis*, 21 F. App'x 360, 362–63 (6th Cir. 2001) (concluding that denial of the right to testify is not structural error but is properly subject to harmless error analysis); *White v. Steele*, 629 F. App'x 690 (6th Cir. 2015) (court concluded violation of the right to testify was subject to harmless error analysis); *Gray v. Wolfenbarger*, 501 F. App'x 427, 430 (6th Cir. 2012) (same).  The court of appeals'

determination that Petitioner's waiver of the right to testify, even if involuntary, did not result in plain error affecting a substantial right under Michigan law is "analogous to a harmless-error analysis because [the court's] conclusion that the error did not affect the outcome of the case is another way of saying that the error was not harmful." *Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016). Under *Wright*, the state court's harmless error determination would be an adjudication on the merits entitled to AEDPA deference. *Id.*, citing *Davis v. Ayala*, 576 U.S. 257 (2015).

More recently, however, the Sixth Circuit has stated that a habeas court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), as opposed to the *Brecht* standard coupled with an evaluation of the state-court's application of the *Chapman* standard under the AEDPA standard. *Davenport v. Maclaren*, 964 F.3d 448, 454–59 (6th Cir. 2020)[7] (citing *Davis*, 576 U.S. at 268 (holding that the *Brecht* test subsumes the limitations imposed by AEDPA) (citing *Fry v. Pliler,* 551 U.S. 112, 119–20 (2007))).

For reasons of finality, comity, and federalism, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). There must be more than a "reasonable possibility" that the error was harmful. *Brecht*, 507 U.S. at 637 (internal quotation marks omitted). The *Brecht* standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was

---

[7] The Supreme Court has recalled the mandate in *Davenport*, *Brown v. Davenport*, 141 S. Ct. 1288 (2021), and granted a writ of certiorari, *Brown v. Davenport*, 141 S. Ct. 2465 (2021).

prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam).

This Court concludes that Petitioner's waiver of the right to testify did not have a substantial or injurious effect or influence on the result in Petitioner's case.  Petitioner's story about the threat was weak from the outset.  "Don't be a rat, I know Duane" could be interpreted as a command to not testify against Duane—even though Petitioner did not really have anything to say against Duane—but the words cannot be stretched to an instruction to refrain from testifying altogether.  Nor can those words be stretched as far as Petitioner attempts in his habeas petition:  to mean "do not testify regarding your affair with the victim."

Moreover, Petitioner's shifting story regarding those words and their import also call into question his credibility.   He could not keep his story straight regarding the threat or the testimony he was purportedly precluded from presenting.  To support the shift in his proposed testimony from the criminal culpability of Duane to Petitioner's affair with the victim, he did everything he could to buy corroboration from friends, but his offers to purchase that corroboration were so apparent and so well-memorialized that he decided he could not even risk calling them to testify on his behalf.

The trial judge was measured in her response to Petitioner's shifting presentation; she did not reject Petitioner's credibility wholesale.  Nonetheless, every time that resolution of an issue depended upon competing testimony from Petitioner and anyone else, the court concluded that Petitioner's testimony was not credible.  That factual determination is well-grounded in the record and entitled to deference.

This Court concludes that Petitioner offers no credible testimony that might overcome the wealth of evidence the prosecutor offered at trial.  That conclusion does not vary

29

whether it is based on deference to the state courts' well-founded determinations regarding Petitioner's lack of credibility or this Court's own review of the record.  The error of which Petitioner complains, if it was error at all, was harmless.  Thus, he is not entitled to habeas relief.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claim would be debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

Moreover, for the same reasons the Court concludes that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right—specifically his utter lack of credibility—the Court concludes that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

For the foregoing reasons, the Court denies the habeas petition and a certificate of appealability. Finally, the Court certifies that an appeal would not be taken in good faith.

Dated:   December 9, 2021                     /s/ Janet T. Neff
                                              Janet T. Neff
                                              United States District Judge